**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MORRIS JOHNSON, JR.,<br>    *Plaintiff-Appellant,*<br>v.<br>COLUMBIA PROPERTIES ANCHORAGE,<br>LP,<br>    *Defendant-Appellee.* | No. 04-35592<br>D.C. No.<br>CV-03-00054-A-<br>RRB |
| MORRIS JOHNSON, JR.,<br>    *Plaintiff-Appellee,*<br>v.<br>COLUMBIA PROPERTIES ANCHORAGE,<br>LP,<br>    *Defendant-Appellant.* | No. 04-35671<br>D.C. No.<br>CV-03-00054-RRB<br>OPINION |

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted
July 14, 2005—Anchorage, Alaska

Filed February 10, 2006

Before: Alfred T. Goodwin, Melvin Brunetti, and William
A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

1615

## COUNSEL

Hugh G. Wade, Wade, Kelly & Sullivan, Anchorage, Alaska, for the plaintiff-appellant/appellee.

Douglas J. Serdahely and Michael A. Grisham, Patton Boggs, Anchorage, Alaska, for the defendant-appellee/appellant.

## OPINION

W. FLETCHER, Circuit Judge:

Morris Johnson sued Columbia Properties Anchorage LP ("Columbia") for breach of contract in an Alaska state court, alleging, inter alia, that Columbia failed to pay for crane services he provided in connection with the construction of the Marriott Hotel in Anchorage. After Columbia removed the case, the federal district court denied Johnson's motion to remand and granted Columbia's motion for partial summary judgment. We hold that the district court properly exercised jurisdiction over this case, and that it correctly held that Johnson's claim for payment for the crane services is time-barred. Finally, we hold that the district court did not abuse its discretion in denying attorneys' fees to Columbia.

### I.  Background

Johnson is a citizen of Alaska. Columbia is a limited partnership organized in Ohio. Its two partners, CP Anchorage, GP, LLC, and CSC Holdings, LLC, are limited liability companies (LLCs), also organized in Ohio. The two LLCs are owned by a Kentucky corporation; by an Ohio corporation; and by a trust whose sole trustee is a bank incorporated in Delaware with its principal place of business in Minnesota.

Columbia managed the construction of the Marriott Hotel in Anchorage between 1998 and 2000. In August 1998, Dave Mueller, Columbia's project manager, entered into a contract with Johnson, an independent contractor, under which Johnson agreed to provide crane services. On August 17, 1998, Johnson sent a proposal to Mueller for rental of a 125-ton crane, as well as for wages for a crane operator and an oiler. Brian Prince, a project engineer for Columbia, replied on August 25th, accepting the proposal and summarizing the agreement between Johnson and Columbia. Prince's one-paragraph letter stated that Johnson would provide the "125

1620   JOHNSON v. COLUMBIA PROPERTIES ANCHORAGE

ton truck crane" to Columbia "per your proposal of 8/17/98 to Dave Mueller." Also, "[t]he crane will be required probably sometime in mid-September and be required probably through the end of the year, and periodically after that." The letter further noted that "no other agreements (such as Purchase Orders, Contracts, etc.) will be sent unless you specifically request one." The letter concluded that, unless Prince heard back from Johnson to the contrary, "I will assume that we have reached an agreement for your services to be provided as we need them." The letter did not mention any billing arrangements or any other equipment or services.

Johnson states in his affidavit that in August and September of 1998 he and Mueller discussed other lifting and hoisting services Johnson could contribute to the Marriott Hotel project, and that he sent Mueller his rates for the rental and operation of 50- and 25-ton cranes and a forklift. Johnson states that, based on these discussions, the parties made oral modifications to the agreement summarized in Prince's August 25th letter, expanding the range of services that Johnson would provide to Columbia. Johnson's affidavit summarizes what he contends were the final terms of the agreement, concluded in late September 1998:

> 1) When requested, Johnson would provide the appropriate crane or hoist to satisfy Columbia's requirements; 2) both parties would maintain ordinary job records, time cards and daily logs, but there was to be no contemporaneous exchange of such records, nor any requirement for signatures or written acknowledgment of receipt of services; 3) at the conclusion of the project [Johnson] would invoice Columbia for [his] services; 4) Columbia would review [his] notice and [the parties] would attempt to resolve any question or discrepancy if there was a conflict between [his] invoice and Columbia's job records . . . [and] 5) the invoice or invoices would be

due and payable promptly after submittal, and if unpaid, would draw interest from the invoice date.

Johnson stated in his affidavit that he provided crane services during four periods beginning in late September 1998: (1) he provided a 50-ton crane on four different occasions from September 28, 1998, through December 5, 1998; (2) he provided the 125-ton crane described in the August 28 letter for one month beginning on December 4, 1998; (3) he provided a 20-ton crane from January 15, 1999, through August 8, 1999; and (4) he provided the 50-ton crane from July 29, 1999, to August 3, 1999.

According to Johnson's affidavit, he submitted a handwritten summary of his work logs to Mueller shortly after he finished providing the crane services on August 8, 1999. Johnson states that he provided the summary "so that I could prepare an invoice" once Columbia looked over the logs for "any problems or questions with my summary." Johnson stated that Mueller never got back to him about the summary. As described below, Johnson did not send an invoice to Columbia until sometime in January 2002.

According to Johnson's affidavit, Mueller was replaced by Andy King as project manager sometime in mid to late 1999. In February 2000, King contacted Johnson and asked him to perform cleanup work in a storage yard at Ship Creek, a location near the Port of Anchorage and some distance from the Marriott Hotel. Johnson states in his affidavit that King "understood" his earlier agreement with Columbia, and he implies that King intended the Marriott crane services contract to cover the Ship Creek cleanup work as well. King remembers the transaction differently. He states in his affidavit that the cleanup project was covered by a "stand-alone contract," and that he and Johnson "did not discuss any terms of any sort from any preexisting or ongoing agreement." Johnson used a forklift and a crew of manual laborers to per-

form the cleanup work at Ship Creek. He used no cranes. Johnson completed this work on February 24, 2000.

Johnson sent Columbia an invoice totaling $105,328 in January 2002. This invoice covered all the services he had provided to Columbia, including the crane services at the Marriott Hotel and the cleanup at Ship Creek. On February 14, King responded by expressing surprise at the size and the lateness of the bill. He asked for back-up documentation for the Ship Creek job. There is no indication in the record whether Johnson responded to the request for documentation. On February 13, 2003, over a year after submitting the invoice, Johnson filed this suit for breach of contract in Alaska state court.

Columbia removed the suit to federal court based on diversity of citizenship. Columbia then moved for partial summary judgment on all claims for payment for crane services provided at the Marriott Hotel, contending that they were barred by Alaska's three-year statute of limitations. The district court granted Columbia's motion. Johnson then moved to remand the suit to state court for lack of diversity jurisdiction, contending that Columbia was owned in part by an Alaska citizen. The district court denied the motion. Johnson then successfully moved for summary judgment on his remaining claim for payment for the cleanup at Ship Creek. Finally, although the district court determined that Columbia was the "prevailing party," it declined to award attorneys' fees.

Johnson appeals the partial summary judgment in favor of Columbia on the crane services at the Marriott Hotel, and the denial of his motion to remand to state court. Columbia cross-appeals the district court's refusal to award attorneys' fees.

II.  Standard of Review

The existence of subject matter jurisdiction is a question of law which we review de novo. *Chang v. United States*, 327

| JOHNSON v. COLUMBIA PROPERTIES ANCHORAGE | 1623 |
|---|---|

F.3d 911, 922 (2003). We also review the district court's grant of summary judgment de novo. *Universal Health Servs. Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). We review for abuse of discretion an award or denial of attorneys' fees made pursuant to state law. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003).

### III. Subject Matter Jurisdiction

[1] Columbia is a limited partnership in which the two partners are limited liability companies, or LLCs. Because a partnership is a citizen of all of the states of which its partners are citizens, Johnson's motion to remand to state court for lack of diversity jurisdiction turns on the citizenship of the two LLCs. The citizenship of an LLC for purposes of diversity jurisdiction poses a question of first impression in this circuit.

[2] The federal court's basic diversity jurisdiction extends to "all civil actions where the matter in controversy exceeds . . . $75,000 . . . and is between . . . [c]itizens of different States." 28 U.S.C. § 1332(a)(1). In cases where entities rather than individuals are litigants, diversity jurisdiction depends on the form of the entity. For example, an unincorporated association such as a partnership has the citizenships of all of its members. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990). By contrast, a corporation is a citizen only of (1) the state where its principal place of business is located, and (2) the state in which it is incorporated. 28 U.S.C. § 1332(c)(1).

[3] LLCs resemble both partnerships and corporations. Notwithstanding LLCs' corporate traits, however, every circuit that has addressed the question treats them like partnerships for the purposes of diversity jurisdiction. *See Gen. Tech.*

1624    JOHNSON v. COLUMBIA PROPERTIES ANCHORAGE

*Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120 (4th Cir. 2004); *GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc.*, 357 F.3d 827, 828-29 (8th Cir. 2004); *Rolling Greens MHP, L.P. v. Comcast SCH Holdings LLC*, 374 F.3d 1020, 1022 (11th Cir. 2004); *Handelsman v. Bedford Village Assocs. Ltd. P'ship*, 213 F.3d 48, 51 (2d Cir. 2000); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998). This treatment accords with the Supreme Court's consistent refusal to extend the corporate citizenship rule to non-corporate entities, including those that share some of the characteristics of corporations. *Carden*, 494 U.S. at 189 (treating a limited partnership as having the citizenship of all its members); *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 456-57 (1900) (refusing to extend the corporate citizenship rule to a "limited partnership association" although it possessed "some of the characteristics of a corporation"). This treatment is also consistent with the common law presumption that unincorporated associations are not legal entities independent of their members. *Strotek Corp. v. Air Transp. Ass'n of Am.*, 300 F.3d 1129, 1133 n.2 (9th Cir. 2002). We therefore join our sister circuits and hold that, like a partnership, an LLC is a citizen of every state of which its owners/members are citizens.

[4] Columbia submitted an affidavit by Theodore Mitchel, an officer of both LLCs that are partners in Columbia, describing the three members of the LLCs. ER 108. Two of the members are Columbia Sussex Corp., a Kentucky corporation with its principal place of business in Kentucky, and Anchorage GP, Inc., an Ohio corporation with its principal place of business in Kentucky. The third member is a trust whose sole trustee is a bank incorporated in Delaware with its principal place of business in Minnesota. A trust has the citizenship of its trustee or trustees. *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 464 (1980). In short, none of the three members of the LLCs is a citizen of Alaska.

[5] Johnson has not provided evidence contradicting the evidence of diverse citizenship provided in the Mitchel affida-

| JOHNSON v. COLUMBIA PROPERTIES ANCHORAGE | 1625 |
|---|---|

vit. The district court therefore correctly denied Johnson's motion to remand to state court.

### IV.  Statute of Limitations

[6] Because Alaska state courts would apply Alaska's statute of limitations to Johnson's claim, a federal district court sitting in Alaska is required to do the same. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Sun Oil Co. v. Wortman*, 486 U.S. 717 (1988). Alaska has a three-year statute of limitations for contract claims. Alaska Stat. § 09.10.053. Under Alaska law, a cause of action for breach of contract accrues, thereby triggering this three-year period, when the breaching party becomes obligated to perform. *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486, 490-91 (Alaska 1975).

Johnson provided crane services at the Marriott Hotel between September 28, 1998, and August 8, 1999. He filed suit for breach of contract on February 13, 2003, three and a half years after the last day on which he provided these services. Johnson makes three arguments to support his contention that the three-year statute does not bar his claim for payment. First, he argues that the statute of limitations did not begin to run until he sent his invoice to Columbia on February 13, 2002, two and a half years after the last day on which he provided crane services. Second, he argues that the statute of limitations did not begin to run until he finished the cleanup work at Ship Creek on February 24, 2000. Finally, he argues that his agreement with Columbia should be regarded as an "open account contract," such that the statute of limitations did not begin to run upon the completion of any particular project. The district court rejected all of these arguments. We agree with the district court.

### A.  Invoice Theory

[7] Johnson argues that Columbia had no obligation to pay him until he sent the invoice on February 13, 2002, and that,

1626 JOHNSON v. COLUMBIA PROPERTIES ANCHORAGE

accordingly, the statute of limitations did not begin to run until that date. Even viewing the evidence in Johnson's favor, we cannot conclude that Columbia's obligation to pay accrued only when Johnson submitted the invoice, two and a half years after the crane services were completed. Prince's August 25, 1998, letter to Johnson does not mention billing arrangements. However, the oral modifications Johnson describes in his affidavit obligated Johnson to send an invoice to Columbia "at the conclusion of the project." They further provide that "the invoice or invoices would be due and payable promptly after submittal." Finally, Johnson states in his affidavit that "I provided the services for which I invoiced Columbia in good faith and in reliance on the understanding . . . that I would be paid upon my invoices promptly after completion of the project."

[8] Even if we were to read the orally modified contract as providing that Columbia's obligation to pay did not accrue until Johnson submitted an invoice, the contract contemplated that the invoice would be sent "at the conclusion of the project." In arguing that the statute of limitations should begin running only upon his submission of the invoice to Columbia, Johnson is arguing, in effect, that a period of two and a half years after his completion of the crane services is included in the phrase "at the conclusion of the project." Even taking all inferences in Johnson's favor, we cannot read the phrase that broadly.

[9] Under widely applied principles of contract law, an Alaska court would likely refuse to excuse this delay in starting the clock for the statute of limitations. *See* 31 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 79:14 (4th ed. 2004) ("Where the plaintiff's right of action depends on a preliminary act to be performed by the plaintiff, the plaintiff cannot suspend indefinitely the running of the statute of limitations by delaying performance of the act."); *see also United States v. Colin*, 314 F.3d 439, 443 (9th Cir. 2002) (noting that if the highest court of the state has not pro-

JOHNSON v. COLUMBIA PROPERTIES ANCHORAGE     1627

nounced on an issue of state law, a federal court sitting in diversity should rely on persuasive authorities, including treatises, to predict how the court might rule). If Johnson's two and a half year delay in submitting the invoice were permitted to delay the beginning of the limitations period until the date of submission, the purpose of the statute of limitations would be frustrated. *See Byrne v. Ogle*, 488 P.2d 716, 718 (Alaska 1971) ("[T]he purpose of statutes of limitations is to encourage promptness in the prosecution of actions and thus avoid the injustice which may result from the prosecution of stale claims. Statutes of limitations attempt to protect against the difficulties caused by lost evidence, faded memories and disappearing witnesses.").

### B. Single Contract Theory

[10] Johnson next argues that a single contract covered all the work he provided to Columbia, and therefore the statute of limitations did not begin to run until he completed the cleanup services at Ship Creek on February 24, 2000. Had Johnson indeed performed all his work for Columbia — crane operating and cleanup — under a single contract, he would likely be correct that his cause of action did not accrue until the date of the last service provided. *See* 9 Arthur L. Corbin, *Corbin on Contracts* § 951 (Interim ed. 2002) ("Corbin"). However, when "the breaches involved are breaches of separate and independent contracts," the statute of limitations begins to run with each breach. *Id.* § 952.

[11] While a single contract may have covered the four periods during which Johnson provided crane services to Columbia, it is clear that he performed the cleanup services pursuant to a different agreement. The cleanup work at Ship Creek involved a different kind of service (short-term manual labor versus long-term provision of crane services) at a different location (Marriott construction site versus the Port of Anchorage). All parties agree that the initial contract dealt solely with crane services. Indeed, the August 25, 1998, letter

**1628**   JOHNSON v. COLUMBIA PROPERTIES ANCHORAGE

refers only to the services of the 125-ton crane. Although Johnson insists that Columbia subsequently inquired about the use of a forklift and other equipment, the oral contractual terms he refers to in his affidavit make only vague mention of "the appropriate crane or hoist." Nothing in the record conflicts with King's statement in his affidavit that the cleanup work "was significantly different from the type of work [Johnson] performed previously as a crane operator."

[12] Johnson introduced no evidence to contradict King's statement that they negotiated terms for the cleanup services at Ship Creek that were independent of the terms for the crane services at the Marriott Hotel. Although Johnson states that King "understood" the 1998 agreement he had struck with Mueller, he also argues in his brief, somewhat inconsistently, that King's affidavit should have been inadmissible because "King knows nothing about the [crane services] contract terms or its formation." Moreover, King and Johnson negotiated the terms of the Ship Creek cleanup long after Johnson had provided Columbia with a summary of his crane services in preparation for an invoice. In short, Johnson adduces no evidence, much less evidence sufficient to create a disputed issue of material fact, to suggest that a single contract covered all the work he performed for Columbia.

### C. Open Account Theory

[13] Finally, Johnson argues that his contract with Columbia should have been treated as an "open account," with Columbia's liabilities fixed only at the end of the account period. "Where there has been a series of [transactions] between the parties, constituting a running account, payable as bills may be rendered, there is but one right of action for a balance due . . . ." 9 Corbin § 953. In other words, "the separate transactions are merged into one." *Id.* However, as discussed above, the uncontradicted evidence in the record suggests that the parties intended the crane services and cleanup work to be covered by separate contracts rather than

to be an interconnected series of transactions. Johnson's open account argument therefore founders on the same shoals as his single contract theory.

### V. Attorneys' Fees

[14] On cross-appeal, Columbia contends that the district court, having found that it was the prevailing party, was obliged to award it attorneys' fees. It bases its argument on District of Alaska Local Rule 54.3(b), which directs the district court to apply the Alaska Rules of Civil Procedure to determine a fee award. Alaska Rule 82(a) provides that "[e]xcept as otherwise provided by law . . . , the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule." Alaska R. Civ. P. 82(a). As Columbia points out, this rule is phrased in mandatory terms. However, the rule further provides that "[t]he court may vary an attorney's fee award" based on various considerations, including "other equitable factors deemed relevant." *Id.* §§ 82(b)(3) & (b)(3)(K). The district court based its decision on this last provision, explaining that "[t]he equities in this matter are such that . . . each party shall bear their own attorney fees." Under the circumstances of this case, we do not believe that the district court abused its discretion in declining to award attorneys' fees to Columbia.

### Conclusion

We hold that LLCs have the citizenship of all of their owners/members and that the parties here satisfy the requirements for diversity of citizenship under 28 U.S.C. § 1332. We also hold that the district court properly concluded that Johnson's claims arising from the crane services he provided to Columbia are time-barred, and that the district court did not abuse its discretion in denying Columbia's motions for attorneys' fees.

We therefore AFFIRM the decision of the district court in all respects. Each party shall bear its own costs on appeal.